**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1976-24

HARBORVIEW PLAZA
ASSOCIATES, LLC,

    Plaintiff-Appellant/
    Cross-Respondent,

v.

BLUERISE GROUP, LLC,

    Defendant-Respondent/
    Cross-Appellant,

and

UNIVERSAL ABSTRACT AND
TITLE AGENCY, as a nominal
defendant,

    Defendant-Respondent.

_____

Argued May 20, 2026 – Decided July 8, 2026

Before Judges Gummer, Paganelli and Vanek.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket No. L-2409-22.

Joshua Beinhaker argued the cause for appellant/cross-respondent (Beinhaker & Beinhaker, LLC, attorneys; Dore Beinhaker, on the briefs).

Vahbiz P. Karanjia argued the cause for respondent/cross-appellant Bluerise Group LLC (Epstein Ostrove, LLC, attorneys; Elliot D. Ostrove and Vahbiz P. Karanjia, on the briefs).

PER CURIAM

Plaintiff Harborview Plaza Associates LLC (Harborview) appeals from a March 7, 2024 final judgment entered in favor of defendant Bluerise Group LLC (Bluerise) following a bench trial. Harborview appeals from the judgment providing Bluerise with the return of its initial and additional deposits following the parties' failed real estate transaction pursuant to their Property Purchase and Sale Agreement (Agreement). In addition, Harborview appeals from the denial of its claim for attorney's fees as provided under the parties' Agreement. Bluerise cross-appeals from the same judgment denying its claim for attorney's fees as provided under the parties' Agreement. We vacate the judgment as to the initial deposit, affirm the judgment as to the additional deposit, and remand for the court to consider the parties' claims for attorney's fees as provided under the Agreement.

2

A-1976-24

I.

The parties' dispute arises from their Agreement. The Agreement states that Harborview is "the owner of . . . [a] multifamily apartment complex" and the parties agreed for Harborview to sell the complex to Bluerise. Further, the Agreement states "the Project (as hereinafter defined) is the subject of that certain Section 8 Housing Assistance Payments [(HAP)] Contract." We recite the relevant terms of the Agreement for purposes of the appeal:

> 1. Purchase and Sale of the Project. [Harborview] shall sell and convey to [Bluerise], and [Bluerise] shall purchase from [Harborview], . . . all right, title[,] and interest of [Harborview] in and to the following:
>
> a) Real Property. The real property . . . including all improvements located on the Land ("Improvements"), including, but not limited to a total of 72 apartment units in one building (the "Buildings") . . . .
>
> b) Personal Property. All furniture, furnishings, fixtures, equipment, tools, supplies[,] and other tangible personal property . . . [.]
>
> c) Intangible Property. The following intangibles . . . : (i) any and all Leases (as hereinafter defined) and all commitments, contracts, options[,] or other agreements with respect to the . . . operation of the Real Property or Personal Property . . . .

A-1976-24

The term "Project" as used herein means the aggregate of the Real Property, the Personal Property[,] and the Intangible Property.

. . . .

3. Deposit. Upon execution of this Agreement by all parties hereto, [Bluerise] shall deposit Two Hundred Fifty Thousand and no/100 dollars ($250,000[]), . . . with Universal Abstract and Title Agency ("Escrow Agent") which, together with said interest (the "Deposit"), shall either be applied by [Bluerise] toward the payment of the Purchase Price, returned to [Bluerise] or paid to [Harborview] as provided in this Agreement. Upon the last day of the [i]nspection [p]eriod (as hereinafter defined) an additional deposit of Two Hundred Fifty Thousand and no/100 dollars ($250,000[]) shall be delivered with and considered together with and a part of the Deposit for all purposes hereunder and the initial Two Hundred Fifty Thousand and no/100 Dollars ($250,000.00) shall be non[-]refundable, except as provided in [s]ection 13. or [s]ection 14. of this Agreement.

4. . . . .

. . . .

b) HUD Approval. [Bluerise] shall promptly apply to HUD for consent to assume the HAP [c]ontract, . . . ("HUD Approvals"), and accordingly:

i) [Bluerise], at its sole cost and expense, shall submit those applications, certificates, agreements, information[,] and fees required by HUD to allow for the HUD Approvals.

. . . .

4

v) [Harborview] hereby agrees that neither [it] nor its counsel shall correspond with HUD regarding the transactions contemplated herein without the prior written consent of [Bluerise], which consent shall not be unreasonably withheld, conditioned, or delayed. . . .

vi) [Bluerise] agrees to promptly deliver to HUD all documents and information required in order to obtain the HUD Approvals, and such other information or documentation as HUD reasonably may request, including, without limitation, information to obtain HUD 2530 approval.

. . . .

ix) Closing is expressly conditioned upon HUD Approvals. If HUD Approvals are not obtained prior to the Closing Date . . . either party that is not then in default under this Agreement may terminate this Agreement.

. . . .

6. Conditions Precedent to Closing. The Closing and the obligations of [Bluerise] under this Agreement are subject to the satisfaction of all the conditions set forth in this [s]ection 6. Both [Harborview] and [Bluerise] agree to take all reasonable action to diligently complete all required processing on as timely a basis as possible. Both parties agree to use best efforts to meet the following schedule of conditions precedent, provided, however, that [Harborview] and [Bluerise] agree to reasonable case-by-case extensions to this schedule in the event of delay . . . . If this schedule of conditions precedent is not met, [Bluerise] may (i) terminate this Agreement by

A-1976-24

giving written notice of such termination to [Harborview], and thereafter, <u>the Deposit shall be returned to [Bluerise]</u>, this Agreement shall terminate and the parties shall be relieved of all further obligations to each other . . . .

a) <u>Preliminary HAP Contract Assignment.</u> Not fewer than thirty (30) days prior to the Closing Date, [Bluerise] shall have obtained HUD Approvals.

. . . .

8. Deliveries at Closing.

. . . .

o) <u>Assignment of HAP Contract</u>. Ten days prior to Closing, [Harborview] shall deliver to [Bluerise] original executed HAP Assignment.

. . . .

13. Damage or Destruction.

a) <u>Material Loss</u>. If, prior to Closing, any portion of the Project is damaged or destroyed to a "material" (as hereinafter defined) extent . . . [Harborview] shall notify [Bluerise] in writing . . . and [Bluerise] may, at its option, terminate this Agreement . . . . <u>notwithstanding the terms of this Agreement to the contrary, the Deposit shall be returned to [Bluerise]</u> . . . . <u>For purposes of this [section] 13.a), "material" shall mean damage or destruction of the Project for which the aggregate estimated cost of repair, restoration and rehabilitation (including all indirect and incidental costs and expenses) is in</u>

A-1976-24

> excess of One Hundred Thousand and no/100 Dollars ($100,000[]).

[(Emphasis added and boldface omitted).]

Because Bluerise did not receive HUD's approval for the assignment of the HAP contract, Bluerise terminated the Agreement, and the parties did not close the transaction. Harborview filed a complaint against Bluerise and the parties' Escrow Agent. In its two-count complaint, Harborview alleged Bluerise had breached and was in default of the Agreement. Harborview sought return of the initial and additional deposits from the Escrow Agent, in addition to its attorney's fees.

Bluerise filed an answer with affirmative defenses and counterclaims. In the counterclaims, Bluerise sought a declaratory judgment that it was entitled to have the initial and additional deposits returned plus attorney's fees allowed under the Agreement.

Following discovery, the matter proceeded to a bench trial. The court heard testimony from Dore Beinhaker, on behalf of Harborview, and Benjamin Weinstein, on behalf of Bluerise.

Beinhaker testified he was the managing member of Harborview. He explained a portion of the apartment complex was "subject to a [HAP] contract," where HUD pays the rent directly to the landlord.

A-1976-24

Beinhaker testified the parties' Agreement required Bluerise to remit a $250,000 "non-refundable [deposit] at the end of the inspection period." He stated Bluerise had made the deposit. According to Beinhaker, after the inspection period had been extended and expired, he advised Bluerise the first deposit was non-refundable. Beinhaker explained Bluerise was to remit an additional $250,000. He testified Bluerise made the additional deposit.

In addition, Beinhaker testified the Agreement required Bluerise to "promptly make an application" to HUD to assume the HAP contract. He testified he had "asked several times" about Bluerise's status with HUD, but Bluerise never responded. He also testified Bluerise had denied his request for permission to personally contact HUD.

Nevertheless, Beinhaker testified he "knew somebody[,]" Eugene Walton, a "public official" at HUD, and he had requested the status of Bluerise's assignment application. Harborview sought to enter an August 2022 email between Beinhaker and Walton into evidence. In the correspondence, Beinhaker, in part, wrote: "Hi, hope you are well, any word on approval [with] regard to [Bluerise]?" In response, Walton stated: "[Bluerise] pulled out weeks ago. You need to start having a better relationship with your potential buyers. You cannot use HUD as a go-between."

A-1976-24

Bluerise objected to the email being admitted into evidence.  It contended Walton's statement was being offered for "the truth" and was therefore barred by the hearsay rule.  Harborview countered the email fell within an exception to the bar under N.J.R.E. 803(c)(8).  Harborview argued "[s]tatements in writing by public officials are exceptions to the hearsay rule because they're deemed trustworthy."  Harborview contended "there's public policy.  You don't want to take the person away from his daily activities at his job . . . to bring them into court for the day."

The court "sustain[ed] the [hearsay] objection as to the truth of" Walton's statement.  The court found the email was "not hearsay to the extent that [Beinhaker] got this information and it may be relevant to explain how [Beinhaker] reacted to being told that [Bluerise] pulled out."  The court admitted the email limited to those purposes.

In September 2022, Walton emailed Beinhaker:  "If [Bluerise] is still interested in this transaction, [Bluerise] promised me updated documents reflecting the economic outlook and other things.  I will continue . . . processing when I receive those documents from [Bluerise]."  Harborview sought to move the email into evidence.  However, Bluerise objected on hearsay grounds.  The court found "there's only one statement" from the "HUD official."  The court

9

A-1976-24

sustained the hearsay objection "[a]s to whether or not . . . [Bluerise] actually offered these documents." However, it admitted the email because it "may be relevant to explain how [Beinhaker] reacted to . . . that information." Beinhaker testified he "was surprised to get" the email because he "thought [Bluerise] hadn't completed their application" and because "Walton had told [him] prior, [Bluerise] had withdrawn their application."

On cross-examination, Beinhaker admitted he did not "know what was going on with respect to discussion[s] between [Bluerise] . . . and HUD." In addition, he admitted he had contacted HUD without Bluerise's consent, contrary to the Agreement. However, he explained Bluerise's consent could not be "unreasonably withh[e]ld" and he "felt [Bluerise] was in breach."

Beinhaker testified that Bluerise was in default, and, therefore, it could not terminate the Agreement and reclaim the deposit after the HUD condition precedent was not met. He acknowledged Bluerise terminated the Agreement and Harborview did not return its deposit. He asserted the term "deposit" did not "include the entire amount." Further, he "guess[ed]" the Agreement defined the "project" to include "[I]ntangible [P]roperty" such as "contracts with respect to the operation of the [R]eal [P]roperty or the [P]ersonal [P]roperty."

10

Moreover, Beinhaker recited his email to Walton that had preceded Walton's September email to him:

> "Good morning, [Walton].  I hope you had a great weekend.  I communicated both to the broker, [Bluerise]'s attorney and [Bluerise]'s principal representative, . . . Weinstein, that I was told that [Bluerise] had withdrawn their application to assume the Harborview HAP contract weeks ago.  I did so both verbally and by email.  I was told via email by [Bluerise]'s representative" . . . "I don't know who told him that, as it is completely untrue. [Bluerise]'s lawyer verbally told me that was not accurate."
>
> "Regardless, we are very much -- we very much want to close title in accordance with our contract to sell Harborview to them and would much appreciate approving their assumption of our HAP contract as soon as possible.  It would be in the best interest of both Harborview Apartments and the tenants to transfer ownership to them as soon as possible."
>
> "If there is anything you need from Harborview . . . to expedite this matter, please contact me immediately.  Thanking you for your anticipated attention to this matter. . . ."

Weinstein testified Bluerise had signed the Agreement and made the first deposit.  Thereafter, he stated Bluerise "began the process of . . . due diligence and started collecting documents and doing a physical inspection of the property."  He indicated Bluerise had not "complete[d its] due diligence within

11

the inspection period" and requested an extension. The extension was granted, and "at the end of the due diligence period," Bluerise made the second deposit.

Weinstein testified Bluerise had submitted an assignment application to HUD. Further, Weinstein stated he, his attorney, and a HUD representative had participated in a conference call. Weinstein testified that HUD wanted to make sure Bluerise was "the right fit" to purchase the property. Weinstein stated he was "very confident" the application would be approved because he had made other purchases with HUD contracts and had been granted approval. Further, Weinstein testified HUD had requested "updated financials" and they were "promptly" submitted.

Weinstein testified HUD had denied the application because Bluerise was not the "right fit based upon the criteria." On cross-examination, Weinstein acknowledged the HUD denial letter, which stated: "We met with you . . . and you expressed concerns about owning this property in light of the growing uncertainty of the macroeconomic environment in terms of higher inflation, interest rates, along with difficulties filling vacant units with good standing tenants." However, he testified he did not know what HUD was specifically referencing. He recalled there was a "phone call" and HUD was pressing on the "financial capabilities and experience with dealing with properties that needed

12

A-1976-24

. . . more work than a typical property."  However, he explained it "was just a general conversation about everything going on in the market."

Moreover, Weinstein testified he did not recall ever directly expressing any concerns.  In fact, he testified on "the contrary, [he] expressed that [he] felt confident that [he] was able to purchase this property and make sure it r[a]n[] smoothly, just like [he had] done with the other properties that ha[d] a HAP contract."  Further, he stated he "definitely never told [HUD] that" he wanted to "pull[] out" of the application process.

Weinstein explained as a result of the HUD denial, Bluerise had terminated the Agreement and requested a refund of the deposit.  Further, he stated there was no physical damage to the property "in excess of $100,000."  Weinstein testified HUD's approval was necessary because "[y]ou cannot purchase a property with a HAP contract without getting HUD approval."  Moreover, he stated the Agreement made HUD's approval necessary.

In a decision placed on the record, the trial court found "that the parties entered an [A]greement for the purchase of property which was the subject of a HAP contract."  The court found the Agreement "contemplated two phases."  One phase "was a due diligence phase" during which Bluerise "had to make a $250,000 good faith deposit."  The court found "at the end of this due diligence

13

A-1976-24

period, that $250,000 would become non-refundable." The court found the second phase required Bluerise "to make an additional $250,000 deposit." Further, the court found during the second phase Bluerise "was to make an application to . . . HUD, for the assignment of th[e] HAP contract."

The court found "[d]uring the course of this second" phase, Beinhaker testified he was advised by someone at HUD that Bluerise "pulled out." Nevertheless, the court found Bluerise "went through the process, and eventually, . . . HUD denied [Bluerise's] application in a letter."

The court noted Bluerise had asserted it was entitled "to get back their entire deposit of $500,000" and Harborview asserted Bluerise was "not entitled to any of" the deposit. Further, the court noted Harborview's position that the phase one deposit "became non-refundable." Moreover, Harborview had posited that Bluerise "violated the [Agreement] by not timely pursuing the application for this HAP assignment. And therefore, they breached the [Agreement] and lost their right to the return of the deposit."

The court considered whether Bluerise "breached the [A]greement by not making a timely application" and whether Bluerise "deep-sixed the application so that they would create a pretense to allow them to get their money back." The court found the "only evidence as to a non-timely application c[a]me[] from

14

hearsay [emails] from [a] HUD employee." During trial, the court had ruled Harborview could not "use the emails from th[e] HUD employee to prove that fact." In addition, the court had ruled Harborview could not use the "email to support a conclusion that [Bluerise] in fact pulled out." The court noted Weinstein's testimony that Bluerise "never pulled out." The court found HUD had denied the assignment to Bluerise, and, as a result, Bluerise terminated the Agreement.

The court found "the entire [A]greement was contingent upon" HUD's approval of the HAP assignment to Bluerise. The court recited from the Agreement: "'Closing is expressly conditioned upon HUD approvals. If HUD approvals are not obtained prior to the closing date as hereinafter defined, either party that is not then in default under this [A]greement may terminate this [A]greement.'"

The court stated "it [wa]s not convinced by a preponderance of the evidence that [Bluerise] defaulted." Instead, it found "according to the evidence," Bluerise pursued the assignment. Moreover, "despite those efforts" and "giving [HUD] additional information, according to . . . Weinstein, they were still denied." The court found "HUD, in effect, . . . didn't believe [Bluerise] w[as] the right fit." Therefore, the court concluded it could not "find that

15

[Bluerise] w[as] in default." Further, the court concluded there was no evidence Bluerise did not "act in good faith" and any assertion otherwise was based on "suspicion" and was "speculative."

The court turned its analysis to the deposits. The court considered the meaning of "non-refundable" as to the initial deposit. The court recited from section 3 of the Agreement. The court found the initial deposit was "not unconditionally [non-]refundable" because exceptions were provided in sections 13 and 14. The court interpreted section 13 and found the "failure to get a HAP approval [wa]s such damage that it would give [Bluerise] the right to terminate."

Further, the court considered "whether the failure to get the HAP approval was a material loss under [section] 13[.a)] which would allow [Bluerise] to terminate the [A]greement." The court stated "the question . . . [was] whether the HAP agreement [wa]s [I]ntangible [P]roperty such that its non-approval . . . [wa]s a material loss and therefore trigger[ed] the right to terminate under [section] 13[.a)]." The court concluded "the HAP agreement . . . [was] clearly assignable because [Harborview] agreed to assign it." Moreover, the court found the HAP agreement was "an agreement with respect to the operation of the real property[.]"

A-1976-24

The court found "the assignment of the HAP agreement was an essential ingredient in th[e] whole process." Further, Bluerise "got turned down by HUD and . . . [Bluerise] had a right to terminate the [A]greement." Also, the Agreement "allows [Bluerise] to retrieve both deposits. Even the non-refundable[ b]ecause [the deposit] became refundable because the HAP agreement was disapproved." Thus, the court concluded Bluerise was "entitled to retrieve the deposit."

Harborview filed an appeal, and Bluerise cross-appealed.

## II.

On appeal, Harborview argues the court misinterpreted section 13 and it was entitled to the initial deposit under section 3 because it was non-refundable at the conclusion of the due diligence period. Further, it contends Bluerise breached the Agreement and the implied covenant of good faith and fair dealing by failing to file the "HUD application promptly and by seeking denial of its own application." In this respect, Harborview contends the court erred in barring Walton's emails as hearsay, because the statements of a public official qualify as an exception to the hearsay bar under N.J.R.E. 803(c)(8)(a). Additionally, Harborview argues because of Bluerise's default, it is entitled to the additional deposit.

17

Following a bench trial, "[t]he scope of appellate review of a trial court's fact-finding function is limited." Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011) (quoting Cesare v. Cesare, 154 N.J. 394, 411 (1998)). We review final determinations made by the trial court "premised on the testimony of witnesses and written evidence at a bench trial, in accordance with a deferential standard." D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013). Our Supreme Court has recognized "an appellate court's review of a cold record is no substitute for the trial court's opportunity to hear and see the witnesses who testified on the stand." Balducci v. Cige, 240 N.J. 574, 595 (2020). "[W]e defer to the trial court's credibility determinations because it 'hears the case, sees and observes the witnesses, and hears them testify, affording it a better perspective than a reviewing court in evaluating the veracity of a witness.'" City Council of Orange Twp. v. Edwards, 455 N.J. Super. 261, 272 (App. Div. 2018) (quoting Gnall v. Gnall, 222 N.J. 414, 428 (2015)) (internal quotation marks omitted). "'Only when the trial court's conclusions are so clearly mistaken or wide of the mark' should we interfere to 'ensure that there is not a denial of justice.'" Gnall, 222 N.J. at 428 (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)) (internal quotation marks omitted). We review de novo the trial "court's interpretation of the law and the legal consequences that flow from

established facts." Accounteks.Net, Inc. v. CKR L., LLP, 475 N.J. Super. 493, 503-04 (App. Div. 2023) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

We review "a trial court's evidentiary rulings . . . with substantial deference and will not overturn such a ruling unless it constituted a clear abuse of discretion." Hrymoc v. Ethicon, Inc., 254 N.J. 446, 463 (2023). Abuse of discretion "arises when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. Immigr. & Naturalization Serv., 779 F.2d 1260, 1265 (7th Cir. 1985)).

"Hearsay is 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'" State v. Branch, 182 N.J. 338, 357 (2005) (quoting N.J.R.E. 801(c)). "Hearsay is inadmissible unless it falls within one or more of the exceptions enumerated in our evidence rules." State ex rel. J.A., 195 N.J. 324, 336 (2008); see also N.J.R.E. 802. "When a hearsay statement contains, in turn, another hearsay statement, the embedded hearsay must independently fall within

one of the exceptions . . . to be admissible." N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 367 (2017); see also N.J.R.E. 805.

Under Rule 803(c)(8):

> Public Records, Reports, and Findings. . . .
>
> > (A) a statement contained in a writing made by a public official of an act done by the official or an act, condition, or event observed by the official if it was within the scope of the official's duty either to perform the act reported or to observe the act, condition, or event reported and to make the written statement; . . . .
>
> > . . . .
>
> This exception does not apply if the sources of information or other circumstances indicate that such statistical findings are not trustworthy.
>
> [(Boldface omitted).]

There are two reasons for the Rule:

> (1) the special trustworthiness of official written statements is found in the declarant's official duty and the high probability that the duty to make an accurate report has been performed and (2) to avoid the necessity of compelling a public official to leave his daily functions to testify as to an event which he will most likely not remember.
>
> [Villanueva v. Zimmer, 431 N.J. Super. 301, 314 (App. Div. 2013) (citations omitted) (quoting Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 1 on [Rule] 803(c)(8) (2013)).]

20

"[T]rustworthiness is the cornerstone of the public records exception to the hearsay rule." Id. at 317. The trial court must be "cautious" about its use. Ibid.

"The interpretation and construction of a contract is a matter of law for the trial court, subject to de novo review on appeal." Cumberland Farms, Inc. v. N.J. Dep't of Env't Prot., 447 N.J. Super. 423, 438 (App. Div. 2016). "'It is well-settled that [c]ourts enforce contracts based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract.'" Serico v. Rothberg, 234 N.J. 168, 178 (2018) (alteration in original) (quoting In re County of Atlantic, 230 N.J. 237, 254 (2017)) (internal quotation marks omitted). "A reviewing court must consider contractual language in the context of the circumstances at the time of drafting and . . . apply a rational meaning in keeping with the expressed general purpose. [I]f the contract into which the parties have entered is clear, then it must be enforced as written." Ibid. (alteration and omission in original) (quoting Atlantic, 230 N.J. at 254-55). "Contracts should be read 'as a whole in a fair and common sense manner.'" Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 118 (2014) (quoting Hardy ex rel. Dowdell v. Abdul-Matin, 198 N.J. 95, 103 (2009)).

The court's "task [i]s 'not to rewrite a contract for the parties better than or different from the one they wrote for themselves.'" Globe Motor Co. v. Igdalev, 225 N.J. 469, 483 (2016) (quoting Kieffer v. Best Buy, 205 N.J. 213, 223 (2011)). A "'court has no [authority] "to rewrite the contract merely because one might conclude that it might well have been functionally desirable to draft it differently."'" Impink ex rel. Baldi v. Reynes, 396 N.J. Super. 553, 560 (App. Div. 2007) (quoting Karl's Sales & Serv., Inc. v. Gimbel Bros., Inc., 249 N.J. Super. 487, 493 (App. Div. 1991)). Moreover, a court may not "remake a better contract for the parties than they themselves have seen fit to enter into, or to alter it for the benefit of one party and to the detriment of the other." Ibid. (quoting Gimbel Bros., 249 N.J. Super. at 493).

A party claiming breach of contract has

> the burden to prove four elements: first, that "[t]he parties entered into a contract containing certain terms"; second, that "plaintiff[s] did what the contract required [them] to do"; third, that "defendant[s] did not do what the contract required [them] to do[,]" defined as a "breach of the contract"; and fourth, that "defendant[s'] breach, or failure to do what the contract required, caused a loss to the plaintiff[s]."
>
> [Globe Motor Co., 225 N.J. at 482 (alterations in original) (quoting Model Jury Charges (Civil), 4.10A, "The Contract Claim—Generally" (approved May 1998)).]

22

"A covenant of good faith and fair dealing is implied in every contract in New Jersey." Wilson v. Amerada Hess Corp., 168 N.J. 236, 244 (2001). Thus, "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Id. at 245 (quoting Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 420 (1997)); see also Cumberland Farms, Inc., 447 N.J. Super. at 443 (same).

## A.

Our analysis starts with consideration of the initial deposit. Section 3 provides the initial deposit "shall be non-refundable except as provided in [s]ection 13, or [s]ection 14." Thus, we turn to sections 13 and 14. Section 14 addresses the disposition of the deposit upon either party's default, and the court did not find either party was in default. Thus, we dispense with section 14 because it is inapplicable.

Section 13 is implicated if "the Project is damaged or destroyed to a 'material' . . . extent" meaning "the aggregate estimated cost of repair, restoration[,] and rehabilitation . . . is in excess of" $100,000. For purposes of our opinion, we accept the court's interpretation of the Agreement that HUD's denial of the HAP assignment "damage[d] or destroyed" the Intangible Property "portion of the Project." However, that interpretation of the Agreement does not

23

end the analysis. Bluerise was required to establish costs in excess of $100,000, as a result of the damage or destruction, and there is no evidence of costs exceeding this amount, nor any finding by the court on this issue. Under these circumstances, Bluerise is not entitled to the non-refundable initial deposit under section 13. We conclude, as a matter of law, the court erred in its interpretation of section 13 of the Agreement.

Lastly, we consider whether HUD's denial of the HAP assignment to Bluerise permitted Bluerise to retrieve the initial deposit because of the failure to satisfy a condition precedent under section 6. Section 6 provides if a "condition[] precedent is not met . . . the Deposit shall be returned to" Bluerise.

However, we do not construe the section 6 remedy to include the initial deposit. We reach this conclusion because the Agreement's specific language, defining "Deposit" in section 3, provides the initial deposit is non-refundable. Where the parties sought to create an exception to non-refundability they explicitly did so only in sections 13 and 14. The omission in section 6 is glaring. Further, the Agreement clearly establishes the parties' intent to treat the "inspection period" and HUD approval differently. Thus, in section 3, "[u]pon the last day of the [i]nspection [p]eriod . . . [the] additional deposit" was due and the initial deposit became non[-]refundable." The different treatment of the

24

deposits reveals the parties' intent that once the inspection period was over, the initial deposit was non-refundable.

Therefore, we vacate the judgment as to the initial deposit. Harborview was entitled to retain the initial deposit.

B.

Next, we consider the additional deposit. Under section 6, if HUD did not approve the assignment of the HAP contract to Bluerise, Bluerise could "terminate th[e] Agreement . . . [and] the Deposit shall be returned to" Bluerise.

Harborview argues Bluerise was in default under the Agreement because it had failed to "promptly apply to HUD for consent to assume the HAP contract," under section 4.b); and sabotaged the HUD assignment by breaching the implied covenant of good faith and fair dealing. Further, Harborview argues the court erred in its evidentiary ruling barring the Walton hearsay email. We disagree.

The court specifically found no evidence that Bluerise did not "act in good faith." Further, it found Bluerise's assertion was based on "suspicion" and "speculati[on]." We have no cause to reject the court's findings in this respect.

Moreover, Harborview's evidentiary argument is unconvincing. Harborview contends the court erred in barring Walton's email to establish the

25

truth that Bluerise "pulled" its application. Harborview asserts: "Of course, it is difficult, if not impossible, to have a HUD official come to testify. This is why we have [Rule] 803(c)(8)(a). It is because their statements are reliable, and it is almost impossible to have them come testify in state court."

Putting aside Harborview's conjecture concerning the ability to properly present evidence from HUD, Harborview misconstrues the Rule. The Rule requires the court to determine the trustworthiness of the statement. See Villanueva, 431 N.J. Super. at 317. The statement is not necessarily trustworthy merely because it is made by a public official. Moreover, Walton's communication with Beinhaker, subsequent to the challenged email, renders questionable the trustworthiness of the email regarding the truth of Bluerise pulling its application.

Further, the Rule requires the court to determine the declarant's official duties. There is no evidence of Walton's official duties in the record. The Rule requires the court to confirm that the declarant's official duties include making the "written statement." There is no evidence in the record to establish Walton's email was part of his official duties. Thus, we are satisfied the court did not abuse its discretion in barring the Walton email for its truth.

A-1976-24

We conclude there is no merit to Harborview's arguments regarding the court's finding about Bluerise not being in default of the Agreement, nor the court's evidentiary ruling. Therefore, Bluerise was entitled to reimbursement of the additional deposit.

III.

Next, we consider Harborview's appeal and Bluerise's cross-appeal regarding the collection of their attorney's fees. The Agreement provides:

> 15. Attorney's Fees. In the event that any party hereto brings an action or proceeding for a declaration of the rights under this Agreement, for injunctive relief, for an alleged breach or default of this Agreement, or any other action arising out of this Agreement or the transactions contemplated hereby, or in the event any party is in default of its obligations pursuant hereto whether or not suit is filed or prosecuted to final judgment, the non-defaulting party shall be entitled to reasonable attorneys' fees as may be allowed by the [c]ourt at the time of settlement, at trial or any appeal or petition to review therefrom, in addition to any court costs incurred and in addition to any other damages or relief awarded.

Because the court determined Bluerise did not default, did not breach the Agreement, and was entitled to a refund of the initial and additional deposits, it did not reach Harborview's request for fees. However, we have determined, under the Agreement and as a matter of law, Harborview was entitled to retain

27

the initial deposit. Therefore, we consider whether, under the Agreement and as a matter of law, Harborview is entitled to its attorney's fees under section 15.

We also consider Bluerise's cross-appeal concerning the trial court's denial of its request for attorney's fees as provided under the Agreement. Regarding Bluerise's request for attorney's fees, the trial court stated:

> Yes. I . . . considered that. It . . . allows it. . . . Within the discretion of the [c]ourt, I could have allowed attorney's fees. I don't think it's mandatory under the law.
>
> And based on the facts, . . . this wasn't frivolous litigation. Both sides had cogent arguments as to why they felt they were entitled to the money. So I'm not going to award attorney's fees under these circumstances.

Bluerise argues the trial court erred because the parties' use of the word "shall" in section 15 "mandate[d] an award of attorneys' fees and costs." It requests we remand for further proceedings concerning fees and costs.

Appellate review of a trial court's decision granting or denying counsel fees "will be disturbed only on the rarest occasions, and then only because of a clear abuse of discretion." In re A.D., 259 N.J. 337, 351 (2024) (quoting Rendine v. Pantzer, 141 N.J. 292, 317 (1995)). See Flagg, 171 N.J. at 572 (defining the abuse of discretion standard).

A-1976-24

"'New Jersey has a strong public policy against the shifting of costs' and . . . 'has embraced that policy by adopting the American Rule, which prohibits recovery of counsel fees by the prevailing party against the losing party.'" In re Est. of Vayda, 184 N.J. 115, 120 (2005) (quoting In re Niles, 176 N.J. 282, 293-94 (2003)) (internal quotations marks omitted).  Therefore, "a prevailing party may not be granted attorney's fees unless authorized by the parties' contract, court rule, or statute." Rock Work, Inc. v. Pulaski Const. Co. Inc., 396 N.J. Super. 344, 350-51 (App. Div. 2007).  New Jersey "recognizes that a party may agree by contract to pay attorneys' fees." Gannett Satellite Info. Network, LLC v. Twp. of Neptune, 254 N.J. 242, 260-61 (2023) (quoting Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 406 (2009) (Rivero-Soto, J., concurring)) (internal quotation marks omitted).  "Notably, New Jersey cases which uphold enforcement of such fee-shifting provisions generally involve breach of agreements entered into in the commercial setting, such as leases, sale of goods, construction contracts and promissory notes." Dare v. Freefall Adventures, Inc., 349 N.J. Super. 205, 222 (App. Div. 2002).

However, "[w]hen the fee-shifting is controlled by a contractual provision, the provision should be strictly construed in light of our general policy disfavoring the award of attorneys' fees." Litton Indus., 200 N.J. at 385;

see McGuire v. Jersey City, 125 N.J. 310, 327 (1991) (The Court found "the lease[] provision in connection with reletting cannot be broadly applied to support an award of attorneys' fees in an action for damages for breach.").

The New Jersey Supreme Court has "applied the same test for reasonable attorneys' fees in contract cases that [it] use[s] in other attorneys' fee award cases in New Jersey." Litton Indus., 200 N.J. at 386. "[T]he threshold issue 'is whether the party seeking the fee prevailed in the litigation.'" Ibid. (quoting N. Bergen Rex Transp., Inc. v. Trailer Leasing Co., 158 N.J. 561, 570 (1999)). "[T]he party must establish that the 'lawsuit was causally related to securing the relief obtained; a fee award is justified if [the party's] efforts are a necessary and important factor in obtaining the relief.'" Ibid. (alteration in original) (quoting N. Bergen, 158 N.J. at 570) (internal quotation marks omitted).

"The next step in determining the amount of the award is to calculate the 'lodestar,' which is that number of hours reasonably expended by the successful party's counsel in the litigation, multiplied by a reasonable hourly rate." Ibid. (quoting Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 21 (2004)).

The Court has provided guidance for "[t]he computation of the lodestar":

> [T]he trial court [must] determine the reasonableness of the hourly rate of "the prevailing attorney in comparison to rates 'for similar services by lawyers of reasonably comparable skill, experience, and

reputation' in the community." Furst, 182 N.J. at 22 (quoting Rendine, 141 N.J. at 337). Further, the court must consider the degree of success in determining the reasonableness of the time expended. Id. at 23. Thus, when a party has succeeded on only some of its claims for relief, the trial court should reduce the lodestar to account for the limited success. Ibid. Moreover, if the same evidence adduced to support a successful claim was also offered on an unsuccessful claim, the court should consider whether it is nevertheless reasonable to award legal fees for the time expended on the unsuccessful claim.

Beyond the lodestar amount, in cases in which the fee requested far exceeds the damages recovered, "the trial court should consider the damages sought and the damages actually recovered." Packard-Bamberger & Co., Inc. v. Collier, 167 N.J. 427, 446 (2001). In addition to that proportionality analysis, the court must evaluate the reasonableness of the total fee requested as compared to the amount of the jury award. That is, when the amount actually recovered is less than the attorney's fee request, the court must consider that fact in determining the overall reasonableness of the attorney's fee award. Ibid. To be sure, there is no precise formula for that portion of the reasonableness analysis. The ultimate goal is to approve a reasonable attorney's fee that is not excessive.

[Litton Indus., 200 N.J. at 387-88 (citations reformatted).]

Here the parties' agreed to fee shifting under two scenarios in the Agreement. First, in the event Harborview defaulted, section 14 provided it "shall pay to [Bluerise] an amount equal to [Bluerise]'s costs incurred in

31

connection with the transaction contemplated by this Agreement, including its reasonable attorneys' fees."  Second, under section 15, "[i]n the event that <u>any</u> <u>party</u> . . . brings an action or proceeding for a declaration of the rights under this Agreement, . . . <u>or</u> any other action arising out of this Agreement or the transactions contemplated hereby . . . shall be entitled to reasonable attorneys' fees."  (Emphasis added).

Conducting our de novo review of the terms of the Agreement, we conclude Harborview was entitled to attorney's fees, under section 15, because it successfully brought an action to establish its right to the initial deposit. Under our case law, Harborview is entitled to fees on this basis.

Similarly, we conclude Bluerise is entitled to attorney's fees under section 15 because it successfully brought an action to establish its right to the additional deposit.  Under our case law, Bluerise is entitled to fees on this basis.  In denying Bluerise's request for fees, the court misapplied its discretion.

We add that the court erred when it interpreted the fee shifting provisions of the Agreement to require a "frivolous" component.  There is no such requirement in the Agreement.  Instead, the parties agreed to fee shifting if they were required to file an action to establish their rights under the Agreement.

32

Therefore, we vacate the final judgment concerning the parties' rights to collect attorneys' fees and remand for further proceedings consistent with this opinion.

We vacate the judgment as to the initial deposit, affirm the judgment as to the additional deposit, vacate the denial of counsel fees, and remand for the court to consider the parties' claims for attorney's fees as provided under the Agreement relating to their respective successful claims.

Affirmed in part, vacated in part, and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M. C. Hanly

Clerk of the Appellate Division

A-1976-24